STATE OF FLORIDA, *ex rel.* FLORIDA RAILROAD COMMISSIONERS, *Relator*, v. ATLANTIC COAST LINE RAILROAD COMPANY, A CORPORATION, *Respondent.*

1.  Matters averred in the return to the alternative writ of mandamus that are not responsive thereto will be stricken on motion.

2.  The return to the alternative writ of mandamus alleges that in view of the loss which would arise to respondent railroad company and other carriers similarly situated by observing the rate for the service of switching cars of lumber to planing mills in transit as prescribed by rule of the Railroad Commissioners should said Commissioners seek by other rules to apply to other points in the State the benefit of similar discriminatory treatment under like circumstances to like products, that every such rule would increase the loss borne by carriers from performance of the service under such losing rate—held such allegations being purely hypothetical may be stricken on motion.

3. Whether or not other subjects of transportation are regulated is immaterial in considering the validity of regulations of particular subjects. The validity of one legislative regulation is not affected by the mere failure to regulate other matters within the legislative power. The choice of subjects of regulation is for the legislature within its powers.

4. The circumstances of each railroad and each market or locality must determine the rates of toll to be properly allowed for the stopping of a commodity in transit for the purpose of treatment. The carrier is entitled to receive some compensation beyond the mere cost of this service and the cost thereof may be greater or less in one city than in another.

5. Even though a demurrer may not be addressed to a fragmentary part of a paragraph of the return to an alternative writ of mandamus, yet where the other fragment thereof has been stricken on motion the demurrer applies to the whole paragraph as it remains.

This case was decided by the court En Banc.

This is a case of original jurisdiction.

### STATEMENT.

This is a case of original jurisdiction. The alternative writ and the motion to quash the same will be found reported in 59 Fla., 612, 52 South. Rep., 4.

The respondent, for answer to the alternative writ filed the following return thereto.

"Now comes the Atlantic Coast Line Railroad Company, respondent, and for answer to the alternative writ of mandamus in the above entitled cause, says:

1. It admits that it is a railroad corporation created under the laws of the State of Virginia, and that on the 1st day of July, 1902, it became the owner of divers lines of railway in the State of Florida, through merger and

consolidation with the Savannah, Florida & Western Railway Company, whose lines, with others since acquired in Florida, including the Jacksonville & Southwestern Railway, it has been operating as a common carrier of persons and property, including rough and dressed lumber, from points in Florida to other points therein.

2.  It admits that the city of Jacksonville, Florida, is an important station on some of the lines of the respondent, where it maintains and operates by virtue of ownership, or the right by lease, contract or otherwise, extensive terminals, railroad yards and switching facilities for the reception, handling, transportation and delivery of property transported by respondent to and from the city of Jacksonville, from and to other points in Florida, and that such terminals, railroad yards and switching facilities or some portion thereof, were maintained and operated by the Savannah, Florida & Western Railway, the predecessor in title of respondent since about the year 1884 and up to July 1, 1902, and that other railroad companies whose lines enter the city of Jacksonville also maintain and operate like terminals, railroad yards and switching facilities for like purposes, and that such terminals and railroad yards, including those of respondent, are physically connected together by transfer tracks and switches, so that their terminal tracks and railroad yards of the city of Jacksonville cover a vast extent of territory in and around said city.  Respondent further answers and says that the growth of the said side tracks and other facilities making up the vast extent of switching facilities in and around the city of Jacksonville has been more or less gradual, and that now the miles of main line and side tracks devoted to terminals, switching and like service, at the city of Jacksonville, are not less than ........ miles, belonging to all the lines entering Jacksonville, with the addition of the tracks of the St. Johns River Terminal

Company, which operates wholly within the city of Jacksonville; and in order to inform the court with the location and extent of these tracks in and about Jacksonville it attaches hereto, marked 'Exhibit A,' a map of the city of Jacksonville, showing in colors, as thereon noted, the tracks belonging to the different lines, with other necessary data marked on said map, to elucidate points needed to be known in connection with issues arising in this litigation, and respectfully makes this exhibit a part of this, its answer.

3. That this respondent admits that said railroad yards in the city of Jacksonville, or a portion thereof, have been maintained for many years past by the railroads entering said city, and as far back at least as the year 1891 planing mills have been established within said yard limits and accessible to the tracks therein; but this defendant denies and says that it is not true that it was or is or has ever been usual and customary for this respondent or any other railroad carrier having or operating tracks in or near said city, to switch upon the order of the consignee cars of rough lumber shipped to and arriving at the city of Jacksonville from other points in the State of Florida for the purpose of dressing the same, and after dressing the same to switch said cars of lumber to some other point in said yard designated by the consignee.

4. That this respondent denies and says that it is not true that in the year 1891, and from thence continuously until the year 1907, the railroad companies entering the said city of Jacksonville, including this respondent and its predecessor the said Savannah, Florida & Western Railway, made a charge of two dollars, or any other sum, per car, for switching cars of rough lumber shipped to the said city to a mill within the yards as aforesaid, and thence after the dressing of the lumber to some other point in the said yards for delivery, or that this charge was the same

whether the said switching movement of the car was over the tracks of one or more railroad companies; but, on the contrary, this respondent avers that neither this respondent nor any other railroad company entering or having and operating tracks in or near said city of Jacksonville, does now or has ever performed such service or offered to perform the same for the price or prices stated in said alternative writ of mandamus, or for any other price whatsoever. This respondent further avers that it has always declined, and still declines to perform such service or to switch upon the order of the consignee cars of rough lumber shipped to and arriving at the said city from other points in the said State of Florida to a saw mill in or near said city, for the purpose of being dressed and thence after being dressed to switch said cars of lumber to another point in said yards. This respondent avers that it has always been ready and willing and is still ready and willing to transport cars of rough or dressed lumber from any planing mill in said city, upon its line, to any point within the yards of this respondent in the said city, upon a separate, distinct and independent order or contract for such movement, upon compensation being made or secured to it in accordance with its tariff of rates for the performance of such services, existing from time to time, but that every such act of transportation and each such movement of any such car constitutes a separate, independent, distinct and new act of transportation, unconnected with the previous transportation and delivery of said lumber to such planing mill, and that such new and independent movements or acts of transportation have never been and are not now treated by said respondent as in any manner constituting the same movement or act of transportation whereby said lumber was brought from points within the State of Florida to said city of Jacksonville, or any part thereof. Respondent

denies that it now holds or has ever held itself out as contracting with any shipper of lumber to move over its rails from the point of manufacture of the rough lumber at the interior mill said lumber to Jacksonville for delivery to consignee at a point upon the yard tracks of respondent, and at said point where a planing mill is located to deliver said rough lumber to a planing mill, and after same has been dressed at said planing mill to then move the said dressed material to a point of delivery to another carrier or to a point of destination on the tracks of respondent in Jacksonville, for the transportation rate fixed by the tariffs promulgated by the Florida Railroad Commissioners with the addition of $2.00 per car, nor at any other sum. Respondent avers that it is, in accordance with its legal duty, transporting lumber over its rails from points in the State of Florida to Jacksonville, at the lawfully fixed rates, and without extra charge has switched the said cars of lumber to any point on the yards of this respondent; and such delivery at the point on its tracks indicated by the consignee absolutely ended all relation of this respondent to such freight.

5. This respondent admits that the Railroad Commissioners of the State of Florida heretofore adopted the rule set forth in the 5th paragraph of the alternative writ as Rule 15-A of the rules governing the transportation of freight, effective January 1, 1909; but avers that same is unreasonable, discriminatory and void for the reasons stated in this answer.

6. This respondent admits that the Railroad Commissioners of the State of Florida have adopted and promulgated the rule set forth in the 6th paragraph of the alternative writ, therein designated as Rule 15 of the rules governing the transportation of freight.

7. This respondent says that it is not true, and it denies that it has charged and received since January 1, 1909, and

is still charging and receiving the sum of $5.00 for switching cars of rough lumber consigned to and arriving at Jacksonville from points in this State to a planing mill in Jacksonville yards, and thence, after the lumber is dressed, to a point in the same yards, when the movement is over its own track only; and further denies and says that it is not true that it has ever charged and received the said sum of money, or any other sum, for such service or act or acts of transportation as alleged. This respondent admits that it has refused to charge or put into effect the rate prescribed in and by said Rule 15-A for the reason that this respondent does not perform or render, and has never performed or rendered, the service prescribed by said Rule 15-A.

8.   By way of fuller and additional answer to said alternative writ respondent avers that there does not now exist upon its line in the State of Florida any practice of or of the character of milling or remilling in transit, such as is contemplated to be done under the terms of said Rule 15-A. Respondent says that it has treated and treats the rough lumber moving from the point of tender for transportation at the mill in Florida consigned to Jacksonville, as a movement to be carried over its rails to Jacksonville and thence, upon order of the consignee, switched to a point of delivery upon the line of respondent, and where consignee designates Eilenberg's Planing Mill (which is the only planing mill located on the lines of respondent in Jacksonville yards) delivery of the rough lumber is made by switching the car to Eilenberg's Planing Mill and there discharged, the car released and all relation of respondent to said freight ended. Respondent avers that should a service be performed as contemplated by the language of said Rule 15-A it would involve the movement in transportation of a distance—say 100 miles —from a Florida point of production of rough lumber

under minimum load of 24,000 pounds, to Jacksonville, which, under the tariffs of the Florida Railroad Commissioners, would carry a rate of $14.00 per car, and that after arrival at Jacksonville, then, on order of consignee requiring the switching of said car to Eilenberg's Planing Mill, and moving the same to Eilenberg's Planing Mill, an average detention of said car of about three days after its arrival at Jacksonville up to the time when the car would be placed at Eilenberg's Mill for discharge would occur, and on the further idea that the service would be continuous from the point of origin of the rough material then the same car would be held idle on the tracks at Eilenberg's Planing Mill until the rough material was dressed and converted into its new form, the car reloaded with the dressed material and moved to some other point on the tracks of this respondent either for delivery to the consignee or to a connecting line, which would entail a further average detention of the car of about nine days, for which entire service after the car reaches Jacksonville no compensation other than the sum named in Rule 15-A is allowed; and that if the service as required by the language of Rule 15-A be a continuing duty respondent would find itself in the position of having to check the number and sizes of pieces of lumber discharged into Eilenberg's Planing Mill from each such car and be under duty of watching the treatment of the rough lumber while being dressed and planed at the mill so as to see that the identical pieces of rough lumber went back on the same car for the further haul, as dressed material, to point of delivery to the consignee on its yards or to a connecting line. Such service, respondent avers, would entail upon it a responsibility to which it ought not to be subjected and a liability as a carrier for the safe return of the contents originally received in its changed form to the point of ultimate delivery of the dressed material. Respondent avers that

the extra detention of a car in the performance of the added service of detention of the empty car at the mill while awaiting reloading with the dressed material, the additional movement of the car as reloaded with treated material to final destination upon its tracks or to delivery to a connecting line, and the time consumed in returning the empty car into service, with a fair allowance for the cost of physical movement in switching or transportation, would be a sum not less than five dollars per car, and this without taking into consideration the value of the tracks and terminals devoted to such use and the expense of organization of the respondent, which should fairly be apportioned over each and every element of traffic. And respondent says that a rate of two dollars per car for the performance of the additional and added service after delivery of the rough material at the planing mill not only affords no profit to respondent but would entail upon it the performance of the service at a positive loss and deprive it of its property without due process of law in contravention of the Fourteenth Amendment to the Constitution of the United States.

Respondent avers that while relators have, by Rule 15 of the Rules Governing the Transportation of Freight, fixed a charge of not more than two dollars per car, without regard to weight or contents, for transporting, switching or transferring a loaded car from any point on any railroad to any connecting railroad or warehouse, sidetrack or other point of delivery that may be designated by consignee, that same is specifically limited to a movement within a distance of three miles from the point of starting, and that said movement ordinarily consumes about three days in the switching of the loaded car until discharged, and yet, by Rule 15-A, for a very much greater service in extent, character and distance is required to be performed without taking into consideration the elements of the

added service or making any compensation therefor, thus requiring the respondent in the performance of said service to limit itself in all respects to the figure of two dollars named in Rule 15-A, and that respondent is entitled to charge and receive for all elements of added service not only some compensation, but that it avers that the sum of five dollars per car for the movement involved in the transaction of the dressed material from the planing mill to the point of delivery on its yards to the consignee or a connecting carrier affords to the respondent no more than a fair and reasonable charge for said service.

Respondent further avers that while there has grown up between carriers throughout the United States a custom of interchanging cars in switching so as to open the tracks and facilities, yards and terminals to other lines to facilitate commerce, that said figure of $2.00 per car is not fixed as, nor is it compensatory for the service performed, but in order to clear the large volume of transactions and to reach some figure to be borne by the line whose volume of tenders in switching service was greatest the figure of $2.00 per car was allowed with deductions under what is known as Car Service Rules for detention and use by the switching line of the car held by it after delivery by the transporting line, and that this is a variable charge and runs from 25c per car per day up to as high as $1.00 per car per day, dependent upon the element of supply and demand and the pressure or ease upon carriers in handling traffic in times of congestion or at times when the volume of traffic offered for movement is light, and that under this system between carriers many privileges are accorded which the law does not require carriers to perform, nor is the same by reason of use changed into duty rather than accommodation. For example: Carriers have freely, as a general rule, permitted their equipment under load to be delivered to connecting lines in transportation on

through routes and joint rates, and carriers performing their full duty of transportation have waived their legal right to decline to permit their equipment to go off their own lines, and where so permitting to require security for the safe return of the car and for the payment of fair compensation for use by some of the connecting and subsequent carriers, and have by comity operated under a system of rules morally binding upon carriers though not intending to be in any respect of legal force or compulsory operation; and that there is nowhere in the laws of Florida nor in any rule or regulation of the relator any protection offered to carriers operating intrastate in Florida, for the safe return of their equipment when delivered to connecting lines or any security given against damage or the value of use while such car is in the custody or possession of such other line, either in transportation or switching service; and that the failure to so legislate makes the said Rule 15-A objectionable to the provisions of the Fourteenth Amendment of the Constitution of the United States, as seeking to take the property of this respondent without due process of law.

Further answering, respondent says that a fair statement of what this respondent and other carriers at Jacksonville have been and are doing is as follows: In the gradual growth and development of the lumber business at Jacksonville, fostered and increased as the lines entering Jacksonville afforded a territory from which to draw, and which growing mileage has carried with it an increase in the number, quantity and distance of side, switch and spur tracks, there has been created the system of tracks shown upon 'Exhibit A' hereof; planing mills sprung up where rough lumber could be dressed so as to meet promptly the demands of dealers for that character of material. There never has been and there is not now any custom or rule where any carrier, including this

respondent, has undertaken to transport from a mill on its line in the interior of Florida to Jacksonville, or to any other point in the State of Florida reached by the line of respondent, rough lumber to be carried to the docks or lines of connecting railway in Jacksonville and then be treated through a planing mill and changed from rough to dressed lumber in transit; but in each and every instance of transportation where planing of lumber has occurred at Jacksonville it has in every instance been, after the rough lumber carrying the rate therefor under the Commissioners' tariffs has reached Jacksonville and the contract of transportation entered into by respondent has been completed, and after notice given the consignee of arrival of the lumber so as to afford consignee the opportunity to have the car of lumber switched to a designated point in Jacksonville yard rather than to dray its contents; such consignee, if he desires the lumber to be dressed, will order it to a planing mill in Jacksonville yards and the carrier receiving such order has uniformly undertaken to switch to any mill upon its line said car of rough lumber without making any charge whatsoever for that service, having waived the charge and treated the switching movement as in effect an addition to the transportation movement and a completion thereof. The rough lumber is discharged at the planing mill without any notice as to its subsequent movement after being dressed, and without the carrier ever knowing who will be the eventual consignee of the dressed lumber. At the planing mill the rough lumber is discharged, the car is released and the carrier under no obligation to retain said car for reload at said mill; and there at said mill said lumber undergoes treatment which so changes its sizes and dimensions that in all respects its identity as a carload of rough lumber is lost; and respondent understands, believes and so avers that in truth the rough lumber becomes com-

mingled with the mass of rough lumber at said planing mill that neither the planing mill nor the person who ordered the lumber into the planing mill for dressing undertake to follow, identify and reclaim the rough lumber as being in its dressed or new shape. From time to time orders are given by the planing mill, and not by the consignee of the lumber, for cars on which to move planed lumber. Such orders are not given by the consignee but are merely given by the proprietor of the planing mill, and either cars released and left at the side tracks near the planing mill for further loads are utilized, or other cars are brought in with which to perform the new and independent service of moving dressed lumber in carload lots from the planing mill to point of destination mentioned in the planing mill's order, and that the carrier does not know, and in the nature of things cannot know, what lumber is being loaded on the cars ordered for the movement of dressed material from the planing mill to another carrier or dock, for that the identity of the original rough lumber has been so completely lost, and the transportation plus switching as a part thereof having been fully completed, it would be a matter of very great risk, trouble and expense if the judgment of this court should order and adjudge that under the operations of Rule 15-A the carrier should treat the movement of a carload of lumber in its rough shape from the mill upon its lines as a continuous service under the mileage rate plus $2.00 per car, through the planing mill, for final delivery, after being dressed, at the dock or point of ultimate destination at Jacksonville, thereby entailing upon the carrier the duty of identifying the rough lumber as discharged from the car into the planing mill, and so follow the rough lumber through its conversion into dressed material, and of the loading of the dressed material in its identical form on the car, and being responsible

in the movement of the dressed material from the mill to destination so as to preserve throughout the identity of the lumber from the mill in the interior to the planing mill, and thence, after being dressed, to the point of final delivery at Jacksonville, Florida.

Respondent further avers that what it has done has been to treat the discharge of the rough material at the planing mill as finally and completely ending all its relations to the freight, and that it and all other carriers at Jacksonville have been in the habit of receiving orders to move dressed material from said mill to be transported on cars supplied after such order is received to the point designated by the planing mill as a new, distinct and independent act of transportation, and to collect a charge which, prior to the fall of 1907, was fixed at $2.00 per car for the movement from the planing mill of the dressed material to the point of destination with Jacksonville yards when over one line, and $4.00 when over more than one line, but which was changed so that where such movement from the planing mill of dressed material to point of destination was upon the line of one carrier, the charge for such transportation was fixed at $5.00 per car, and where the planed material moved over more than one line, then the first carrier collected $5.00 and the subsequent line or lines embraced in the movement thereafter to the point of ultimate destination in Jacksonville yards received the additional $2.00. This service and change of $5.00 or $7.00, as the case may be, had no relation and was entirely separate and apart from the switching charge of $2.00 per car which applied where a car of rough lumber was switched to a planing mill located on the line of a carrier other than the one which transported the rough lumber from its point of origin to Jacksonville. Respondent avers that the movement of dressed lumber from the planing mill at Jacksonville to the point of ultimate

delivery on its line or on the line of other railroads in Jacksonville under the rate of $5.00 and $7.00, as the case may be, is not the beginning of a rail movement beyond Jacksonville, but such movement of dressed lumber from the planing mill to the point of ultimate delivery on the docks at Jacksonville, is complete in and of itself and is a transportation service and should be compensated for as transportation and not as a switching service.

Respondent avers that it and its predecessors had for many years charged only $2.00 for the service of moving the dressed material from the planing mill to point of ultimate destination in Jacksonville yards, but as the facilities grew, causing a large increase in the investment, a large annual increase in taxes, the constant increase in the cost of labor and materials entering into the maintenance and operation, and the vastly wider area over which the service was to be performed, respondent became satisfied that the charge of $2.00 per car for the service of moving the planed material from the mill in Jacksonville to point of ultimate destination was being performed at a continual loss per car, and while ever willing to accord every encouragement to all industries concerned in the upbuilding of Jacksonville, in which the carriers are so interested, they reluctantly but necessarily found, in duty to themselves and to all interests which the carriers served, that this commodity should bear a fair proportion of the expense of operation of the respondent's property and should no longer be favored by the granting of a reduced rate which was not only below the idea of compensation but was being performed at a continual loss, and it put planed lumber, moving without regard to distance, in Jacksonville yards on the same basis that it put similar movements of any other commodity moving under like conditions in Jacksonville yards, and it avers that in so doing it removed a discrimination existing in favor of dressed lum-

ber, and placed dressed lumber on the same basis that all other commodities move in Jacksonville yard under the previously established and continual operating tariffs.

9. This respondent, further answering said alternative writ of mandamus, avers that there are, and for many years past have been, lumber planing mills within the railroad yards of this respondent and other railroads, at cities and places in the State of Florida elsewhere than in or near the city of Jacksonville, which railroad yards are similar in condition, position and circumstances to the railroad yards of this respondent and other railroad carriers in and near the city of Jacksonville, and that such other planing mills at other cities and places in said State manufacture, treat or plane rough lumber brought to such planing mills by rail from other points in Florida, and for a long time past have done so, and that the manufactured or planed lumber so produced by such planing mill is and has been shipped from such planing mills to other points in the railroad yards where said planing mills are respectively situated, and that such planing mills are similarly situated and in like conditions, positions and relations in respect to the receipt, manufacture and treatment of rough lumber received from points in said State, and with respect to the shipment and transportation of the dressed or planed lumber made from such rough lumber, as the lumber planing mills in the yards of this respondent and other railroad carriers in and near said city of Jacksonville; but that said Railroad Commissioners of the State of Florida have never by any rate, rule or regulation extended or applied to any place, point or railroad yards in said State, or planing mills therein, other than in said city of Jacksonville and the railroad yards thereof, the rights and privileges conferred or created, or attempted to be conferred and created, or the rates or charges fixed by said Rule 15-A, nor have said Railroad Commissioners

fixed or regulated or attempted to fix or regulate by any order, rate or rule the charge or rate for the service prescribed or mentioned in said Rule 15-A, or any similar service, as to any other place or railroad yards in Florida than the said city of Jacksonville, or in respect to any commodity whatsoever except rough lumber arriving at said city of Jacksonville, and that said Railroad Commissioners have not in and by any rate, rule or regulation extended to any other commodity than rough lumber arriving at the city of Jacksonville from points in said State of Florida the rate or charge fixed by said Rule 15-A, or any similar rate or charge for the service mentioned in said Rule or any similar service, although other commodities than rough lumber are shipped into said city of Jacksonville, and other places in said State from other points in the State of Florida, to be treated, milled or manufactured into different commodities or products thereof, which other commodities, after being milled, manufactured or treated as aforesaid, are shipped or transported to a point or points in the same railroad yards of such cities, towns or places in said State; and no such rates or charges as those attempted to be fixed or prescribed by said Rule 15-A exist at any place or anywhere in said State by custom or usage of any railroad or other carrier by any other method, system or means or any form; and so it is that said Rule 15-A unreasonably and unlawfully discriminates in favor of the shippers of rough lumber into said city of Jacksonville from points of said State and deprives this respondent of the equal protection of the laws and of due process of law, in violation of the Constitution of the State of Florida and of the Fourteenth Amendment of the Constitution of the United States.

And respondent says that in view of the loss which would arise to it and other carriers similarly situated by observing the rate prescribed by Rule 15-A, it avers that

should relators seek by other rules to apply to other points in the State of Florida the benefit of similar discriminatory treatment under like conditions to like products, that each and every of such rules and regulations would be effective to increase the loss borne by the carrier from performance of the service under such losing rate.

10. Respondent here and now avers that it has not, is not and does not intend to voluntarily perform at a compensation of two dollars per car the service said to be required by the allegations and prayer of the alternative writ.

Wherefore, having fully answered, respondent prays that the writ be discharged and that it go hence with its costs in this behalf sustained."

The relators join issue on that part of the 3rd paragraph of the return to the alternative writ, which begins with the words, "but this defendant denies and says," and ends with the end of said paragraph.

The relators by amended replication, join issue on that part of the 3rd paragraph of the return to the alternative writ, which begins with the words, "but this defendant denies and says," and ends with the end of the paragraph.

And they take issue severally upon each of the following portions of the said return;

On the 4th paragraph.

On the allegation in the 5th paragraph that Rule 15-A is unreasonable, discriminatory and void.

On the 7th paragraph.

On the 8th paragraph, as to the 1st, 2nd, 4th, 5th and 6th subparagraphs thereto severally.

The relators move to strike out severally the following portions of the return to the alternative writ:

"The 3rd sub-paragraph of the 8th paragraph, which begins with the words 'Respondent further avers that while there has grown up between carriers' and ends with

236     SUPREME COURT OF FLORIDA.

State ex rel. Fla. R. R. C. v. A. C. L. R. R. Co.—Statement of Case

the words 'as seeking to take the property of this respondent without due process of law,' because the matters therein averred are not pertinent to any allegation of the alternative writ, but are wholly irrelevant thereto, and have been held by this court not to be involved in this proceeding.

Also the second sub-paragraph of the 9th paragraph, which is as follows: 'And respondent says that in view of the loss which would arise to it and other carriers similarly situated by observing the rate prescribed by Rule 15-A, it avers that should relators seek by other rules to apply to other points in the State of Florida the benefit of similar discriminatory treatment under like conditions to like profits, that each and every of such rules and regulations would be effective to increase the loss borne by the carriers from performance of the service under such losing rate,' because:

1.   The matters therein contained are purely hypo thetical.

2.   Neither the court nor the respondent can make any assumption as to further action by the relators in prescribing other rules.

3.   The matters therein contained present no issue, nor can any issue be properly made upon them which would be pertinent or decisive in this cause.

Also the 10th paragraph of the said return which is as follows:

'Respondent here and now avers that it has not, is not and does not intend to voluntarily perform at a compensation of two dollars per car the service said to be required by the allegations and prayer of the alternative writ.' Because:

1.   So far as the said paragraph may be construed to mean in part that the respondent has not performed and

is not performing voluntarily the service mentioned in the allegations and prayer of the alternative writ at the rate of two dollars per car, that defence has been iterated and reiterated in the preceding portions of the return, and its repetition here is redundant and unnecessary; while so far as the present intention of the respondent not to perform such service in the future voluntarily at said rate is concerned, such intention is wholly immaterial and not pertinent to any matter in the cause.

2. There is no service said to be required by the allegations and prayer of the alternative writ."

The relator filed and amended demurrer to the 1st subparagraph of the 9th paragraph of the return, so that the demurrer as amended reads as follows:

"The relators, by Louis C. Massey their attorney, say that the 1st sub-paragraph of the 9th paragraph (which alleges the defence of the discriminatory nature of Rule 15-A) is bad in substance,

1. For that no sufficient reason is shown therein why the Railroad Commissioners should have extended or applied to any place, point or railroad yards in the State, or planing mills therein, other than in said city of Jacksonville and the railroad yards thereof the rates or charges fixed by said Rule 15-A.

2. For that no sufficient reason is shown therein why the Railroad Commissioners should have extended or applied the rate prescribed in Rule 15-A to any commodity whatever except rough lumber arriving at the city of Jacksonville and other places in the State.

3. For that no sufficient reason is shown therein why said Rule 15-A unreasonably and unlawfully discriminates in favor of the shippers of rough lumber into the city of Jacksonville from points in said State, and deprives the

respondent of the equal protection of the laws and of due process of law."

*L. C. Massey* for Relator.

*W. E. Kay, Doggett & Smith, E. J. L'Engle* and *Geo. P. Raney,* for Respondent.

PARKHILL, J. (after stating the facts).—The motion to strike the third subparagraph of the eighth paragraph, beginning with the words, "Respondent further avers that while there has grown up between carriers," and ending with the words, "as seeking to take the property of this respondent without due process of law," will be granted.

The matters therein averred are not responsive to the alternative writ. The writ nowhere seeks to compel the service whereby the respondent railroad shall part with its cars, neither does the writ require the service over more than one railroad, but seeks to enforce a rate for a switching movement over the respondent's own tracks only. This was made clear in the opinion of this court when considering the motion to quash the alternative writ. At that time we pointed out that rule 15A failed to contain the provision that no railroad company shall decline or refuse to transport, switch, or transfer any loaded car from any point on any railroad to any connecting railroad, or to any warehouse, side-track or other point of delivery, or to receive it from any connecting railroad for such purpose. If, as set up in the return, carriers have, by comity not in any respect of legal force or compulsory operation, permitted their equipment under load to be delivered to connecting lines and waived their legal right to decline to permit their equipment to go off their own lines and to require security for the safe return of the car and for the payment of fair compensation for use by connecting car-

riers, a failure to legislate for the safe return of said equipment, or for the value of the use thereof under a system of rules outside of the law, could not make the said rule 15A objectionable to the provisions of the Fourteenth Amendment to the Constitution of the United States, as seeking to take the property of this respondent without due process of law. It would seem that the system of rules existing by comity of carriers might properly include provisions for the safe return of and fair compensation for the use of said car by connecting carriers.

The motion will be granted to strike the second subparagraph of the ninth paragraph of the return, which is as follows:

"And respondent says that in view of the loss which would arise to it and other carriers similarly situated by observing the rate prescribed by rule 15A, it avers that should relators seek by other rules to apply to other points in the State of Florida the benefit of similar discriminatory treatment under like conditions, to like products, that each and every of such rules and regulations would be effective to increase the loss borne by the carriers from performance of the service under such losing rate."

As set up in the motion to strike, the matters contained in this part of the return are purely hypothetical. We cannot anticipate the future action of the Commissioners. Sufficient unto the day is the evil thereof.

The motion will be granted to strike the 10th paragraph of the return, as follows:

"Respondent here and now avers that it has not, is not, and does not intend voluntarily to perform at a compensation of two dollars per car the service said to be required by the allegations and prayer of the alternative writ."

In explanation of the meaning of this paragraph, respondent says in its brief, "Paragraph ten denies generally that such service was performed; it denies that such ser-

240     SUPREME COURT OF FLORIDA.

State *ex rel.* Fla. R. R. C. v. A. C. L. R. R. Co.—Opinion of Court.

vice was customary; it also states affirmatively that respondent will not in the future do such service. The statement that it does not intend in the future to voluntarily perform such service at two dollars per car is simply another way of stating that it is not holding itself out to perform said service at such price."

· It is nowhere alleged in the alternative writ that respondent is holding itself out to perform said service at two dollars per car. The allegation of the third paragraph of the alternative writ is that for many years planing mills have been established in respondent's yard limits and accessible to the tracks therein, to which it was and is usual and customary for the railroad companies to switch cars of rough lumber for the purpose of dressing the same and after dressing to switch the cars to some other point in the yards, without referring to the charge made for said service. In this way the alternative writ sought to establish the service of milling in transit voluntarily entered upon that may be regulated and the charges therefor supervised by the Railroad Commissioners. The allegation in the writ as to the charge of two dollars for said service and its increase to five dollars and the reduction therefrom to two dollars by the Commissioners was not made for the purpose of showing that the respondent is holding itself out to perform the said service, but this allegation was directed to the regulation of the charge for said service.

This paragraph of the return will be stricken as not responsive to the writ.

The demurrer to the 1st subparagraph of the 9th paragraph of the return will be sustained. The part of the return here referred to is as follows:

"9. This respondent further answering said alternative writ of mandamus, avers that there are, and for many years past have been, lumber planing mills within the rail-

road yards of this respondent and other railroads, at cities and places in the State of Florida elsewhere than in or near the city of Jacksonville, which railroad yards are similar in condition, position and circumstances to the railroad yards of this respondent and other railroad carriers in and near the city of Jacksonville, and that such other planing mills at other cities and places in said State manufacture, treat or plane rough lumber brought to such planing mills by rail from other points in Florida, and for a long time past have done so, and that the manufactured or planed lumber so produced by such planing mill is and has been shipped from such planing mills to other points in the railroad yards where said planing mills are respectively situated, and that such planing mills are similarly situated and in like conditions, positions and relations in respect to the receipt, manufacture and treatment of rough lumber received from points in said State, and with respect to the shipment and transportation of the dressed or plain lumber made from such rough lumber, as the lumber mills in the yards of this respondent and other railroad carriers in and near said city of Jacksonville; but that said railroad commissioners of the State of Florida have never by any rate, rule or regulation extended or applied to any place, point or railroad yards in said State, or planing mills therein, other than in said city of Jacksonville and the railroad yards thereof, the rights and privileges conferred or created, or attempted to be conferred and created, or the rates or charges fixed by said Rule 15-A, nor have said Railroad Commissioners fixed or regulated or attempted to fix or regulate by any order, rate or rule the charge or rate for the service prescribed or mentioned in said Rule 15-A, or any similar service, as to any other place or railroad yards in Florida than the said city of Jacksonville, or in respect to any commodity

whatsoever except rough lumber arriving at said city of Jacksonville, and that said Railroad Commissioners have not in and by any rate, rule or regulation extended to any other commodity than rough lumber arriving at the city of Jacksonville from points in said State of Florida the rate or charge fixed by said Rule 15-A, or any similar rate or charge for the service mentioned in said Rule or any similar service, although other commodities than rough lumber are shipped into said city of Jacksonville, and other places in said State from other points in the State of Florida, to be treated, milled and manufactured into different commodities or products thereof, which other commodities, after being milled, manufactured or treated as aforesaid, are shipped or transported to a point or points in the same railroad yards of such cities, towns or places in said State; and no such rates or charges as those attempted to be fixed or prescribed by said Rule 15-A exist at any place or anywhere in said State by custom or usage of any railroad or other carrier by any other method, system or means or any form; and so it is that said Rule 15-A unreasonably and unlawfully discriminates in favor of the shippers of rough lumber into said city of Jacksonville from points of said State and deprives this respondent of the equal protection of the laws and of due process of law, in violation of the Constitution of the State of Florida and of the Fourteenth Amendment of the Constitution of the United States."

It will not avail the respondent to say that the Railroad Commissioners have never extended or applied the rights and privileges conferred or created, or attempted to be conferred or created, or the rates or charges fixed by Rule 15-A to any place, point or railroad yards or planing mills therein other than in the city of Jacksonville.

Rule 15-A does not confer or create, or attempt to confer or create any rights or privileges. As we have said before,

VOL. 60, JUNE TERM, 1910.    243

State *ex rel.* Fla. R. R. C. v. A. C. L. R. R. Co.—Opinion of Court.

"whether the carrier is or is not under obligations to permit the interruption of the transit, the rule merely seeks to regulate the charge for such service when rendered." State v. Atlantic Coast Line R. Co., 59 Fla., 612, 52 South. Rep., 4. As there pointed out, the service contemplated by Rule 15-A, the stopping of a commodity in transit for the purpose of treatment, is in the nature of a special privilege which the carrier may concede, but which the shipper cannot in the present state of the law demand as a matter of lawful right. The rule does not attempt to create or confer this privilege or right, neither does it seek to compel a service, but merely to fix a rate therefor.

We have also held, and it has become the law of this case, that it is not essential to the validity of this rule that it should prescribe or fix one rate for the service of milling in transit to be rendered in all markets and localities of the State. The circumstances of each road and each market or locality must determine the rates of toll to be properly allowed for this service. State v. Atlantic Coast Line R. Co., *supra.*

Neither does it avail respondent to say, nor have said Railroad Commissioners fixed or regulated or attempted to fix or regulate the charge or rate for the service prescribed or mentioned in Rule 15-A, or any similar service, as to any other place or railroad yards in Florida than the city of Jacksonville.

Section 2893 of the General Statutes of Florida authorizes the commissioners to make reasonable and just rates of freight tariffs to be observed by railroads and common carriers, and to make reasonable and just regulations for the observance of the same as to charges at any and all points for the necessary handling and delivery of freight and for the prevention of unjust discrimination therewith. And so, in Storrs v. Pensacola & A. R. Co., 29 Fla., 617, text 631, 11 South. Rep., 226, this court said: "The statute

directs the commissioners to make for each of the railroads doing business in this State a schedule of just and reasonable rates of charges for the transportation of passengers and freights over each road. Under this statute each road is entitled to have a just and reasonable rate, but a rate reasonable and just in itself for one road may not be so for another, though they connect with each other."

—As we took occasion to say, on the motion to quash the alternative writ, (59 Fla., 612, 52 South. Rep., 4) "the circumstances of each road and each market or locality must determine the rates of toll to be properly allowed for this service. The carrier is entitled to receive some compensation beyond the mere cost of this service, and the cost thereof may be greater or less in one city than in another." A uniform rate is not essential to the legality of this rule; neither is it essential to its validity that the commissioners should have regulated or attempted to regulate the charge or rate for this service in other places or railroad yards than the city of Jacksonville. It may be that the railroad companies have been charging lower or reasonable rates for this service at such other points. It may be that the railroad companies at such other places are performing this service for a rate acquiesced in by the public and the Commissioners as a reasonable and just one, and that the occasion has not arisen for the regulation of the rate by the Commissioners in the exercise of its supervisory power.

Neither is it a good defense to say that the Commissioners have not extended to any other commodity than rough lumber arriving at Jacksonville the rate or charge fixed by Rule 15-A, although other commodities than rough lumber are shipped into said city of Jacksonville to be treated and thence shipped to a point or points in the same railroad yard, as alleged in this paragraph of the

return, aside from the contention that there is here no averment that the conditions are alike, or that the other commodities are such as ought to take the same or a similar rate. As we said in King Lumber & Mfg. Co. v. Atlantic Coast Line R. Co., 58 Fla., 292, 50 South. Rep., 509: "Whether or not other subjects of transportation are regulated is immaterial in considering the validity of regulations of particular subjects. The validity of one legislative regulation is not affected by the mere failure to regulate other matters within the legislative power. The choice of subjects of regulation is for the Legislature within its powers."

Even if the demurrer may not be addressed to a fragmentary part of the 9th paragraph of the return, yet the other fragment thereof has been stricken upon motion, leaving the demurrer to apply to the whole paragraph as it remains.

As the 9th paragraph goes out, it will be unnecessary to consider the motion to compulsorily amend the same.

The parties not having requested leave to amend further, and the cause being at issue, it is ordered that the same be set for trial on the 11th day of October, 1910, upon which day the parties are required to produce their testimony before the court. In the meantime, if either party so desires it may take depositions of witnesses, upon commission issued by the Clerk of this court, or before a justice of the peace in accordance with the statutes of the State and the rules governing circuit courts in the matter of depositions; and the Clerk of this court is directed to issue commissions for the taking of such depositions as may be duly applied for by either party in accordance with such statutes and rules, or the parties by agreement may take testimony before some one authorized to administer oaths.

All concur.